UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
DARWISH HEBA,                             :
                                          :
                    Plaintiff,            :         **OPINION AND ORDER**
                                          :         03 CV 6055 (DLI) (CLP)
          -against-                       :
                                          :
NEW YORK STATE DIVISION OF                :
PAROLE,                                   :
                                          :
                    Defendant.            :
-------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff, Darwish Heba ("Plaintiff" or "Heba"), brings this suit against the New York State

Division of Parole ("Defendant" or the "Division") under Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e, *et seq*, alleging discrimination by race, religion, and national origin resulting in

a hostile work environment. Plaintiff further alleges that Defendant violated Title VII by retaliating

against him for initiating an internal discrimination complaint. In addition, Plaintiff sets forth

several state and common law claims.

Defendant now moves for summary judgment pursuant to Fed. R. Civ. P. 56(c). For the

reasons set forth below, Defendant's motion is granted in part and denied in part. Plaintiff's

discrimination claim is dismissed, but his retaliation claim survives summary judgment. The state

and common law claims are dismissed.

I.      **Facts**

   A.      **Background**

The following facts are undisputed or, where disputed, are either so indicated or taken in a

light most favorable to non-moving Plaintiff. Plaintiff is a parole officer employed by the Division

since April of 1992. (Compl. ¶ 12.)  He is a naturalized American citizen who was born in Egypt and practices the Muslim faith. (Heba Dep. 13:7-20; 32:3-4.)  The Division is an executive department of the government of the State of New York.  N.Y. Executive Law § 259(1).

Shortly after Plaintiff began employment with the Division, he was assigned to the Sex Offenders Unit in the Division's "Brooklyn II" office.  (Heba Dep. 19:8-20:18; Heba Decl. ¶¶ 2-3.) After five years, he moved to the Special Offenders Unit, also in the Brooklyn II office.  (Heba Dep. 20:12-18; Heba Dep. ¶ 3.)  During the period that he worked in these two Units, Plaintiff claims that he had good relationships with his supervisors and received two awards and twenty-five commendations.  (Def.'s 56.1 ¶ 9; Pl.'56.1 ¶ 9; *see* Heba Decl. Ex. A.)

In or about April 2001, Plaintiff was reassigned to work under the supervision of Senior Parole Officer John Zwaryczuk ("Zwaryczuk") in the newly formed Targeted Offenders Program ("TOP") Unit in the Division's "Brooklyn IV" office.  (Compl. ¶ 14; Heba Dep. 21:7-15.)  The TOP Unit was a small unit that supervised parolees who were considered at high risk to commit new crimes.  (Zwaryczuk Dep. 24:18-25; Def.'s 56.1 ¶¶ 10; 15.)  The Unit worked jointly with the 60th and 67th Precincts of the New York City Police Department (the "NYPD") in high crime areas. (Heba Dep. 117:25-119:7.)

Assignments to the Sex Offenders Unit, the Special Offenders Unit, and the TOP Unit are considered "special assignments" filled by candidates who undergo an interview process outside of the seniority system applicable to "regular assignments."  (Oeser Dep. 82:7-83:13.)  While assignment to these Units do not involve a salary increase, Plaintiff states that the work involves substantial overtime, a reduced caseload, high-profile parolees, and/or work with other law enforcement agencies.  (*See* Heba Decl. 36:2-19; 67:24-68:6.)  Plaintiff thus characterizes special

assignments as elite. (Heba Decl. 35:14-22; Pl.'s Mem 7.) According to Defendant, however, the TOP Unit is not elite; not many parole officers were interested in joining the Unit. (*See* Zwaryczuk Dep. 37:1-21.)

**B.    Plaintiff's Relationship with Zwaryczuk**

Plaintiff and Zwaryczuk met each other in the Brooklyn II office prior to Zwaryczuk's promotion to Senior Parole Officer. (Heba Dep. 39:7-22.) Plaintiff states that, at that time, he and Zwaryczuk "were very close, we used to work together all the time." (Heba Dep. 47:18-19.) However, Plaintiff states that Zwaryczuk had a bad temper and frequently used profanity, and most parole officers preferred not to work with him. (Heba Dep. 49:15-50:14; 63:15-23.) Plaintiff further describes Zwaryczuk as hating Jews generally and making anti-Semitic comments in his presence, as well as derogatory and racist comments against African-Americans and Hispanics. (Heba Dep. 50:4-62:25.)

When the TOP Unit was formed, Zwaryczuk and Bureau Chief Alan Reiter ("Reiter") allegedly asked Plaintiff to join the Unit because Zwaryczuk said he trusted Plaintiff and liked the work he did. (Heba Dep. 66:7-12; 67:10-22.) Reiter claims that he had concerns about the proposed work arrangement in which former co-workers would now be working in a supervisor-subordinate relationship. (Reiter Decl. ¶ 4.) Notwithstanding, Plaintiff joined the TOP Unit.

From the beginning of Plaintiff's assignment in the TOP Unit, Plaintiff and Zwaryczuk had conflicts concerning Plaintiff's timeliness and reliability, as well as overtime issues. (Def.'s 56.1 ¶¶ 16-18; Pl.'s 56.1 ¶¶ 16-18.) According to Plaintiff, Zwaryczuk was reluctant to approve overtime hours for the officers in the TOP Unit. (Heba Dep. 103:17-104:24.) Plaintiff further alleges that Zwaryczuk was generally "verbally abusive" and that there was "ongoing hostility" between them.

(Heba Dep. 82:3-5.) The conflict between the two caused Plaintiff, in May or June 2001, to request orally reassignment back to the Special Offenders Unit in the Brooklyn II office. (Heba Dep. 82:6-23.) Apparently, the request went unheeded at the time.

Notwithstanding the differences between Plaintiff and Zwaryczuk, on August 23, 2001, Zwaryczuk recommended Plaintiff, along with another parole officer, for a commendation for their work in the arrest of a parolee and the seizure of drugs and a weapon. (Zwaryczuk Dep. 50:13-52:20; Def.'s 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.) In addition, when Plaintiff applied for a position with the Federal Bureau of Investigation (the "FBI") as an Arabic language interpreter after September 11, 2001, both Zwaryczuk and Reiter provided positive recommendations of Plaintiff to the FBI. (*See* Heba Decl. ¶ 16; Heba Dep. 179:16-17; Zwaryczuk Aff. Ex. A; Reiter Decl. Ex. B.)

### C. July 3, 2001 Overtime Incident

On the evening of July 3, 2001, Plaintiff, pursuant to Zwaryczuk's direction, assisted the NYPD in a homicide investigation involving one of the parolees under Plaintiff's supervision. (Heba Dep. 88:8-24.) The police questioned the parolee at his home and then determined that they needed to question him at their precinct. (Heba Dep. 89:4-13.) The parolee was taken into custody and transported to the police station. (Heba Dep. 89:5-6.) Plaintiff accompanied them. (Heba Dep. 89:5-6.) Plaintiff called Zwaryczuk to inform him that the police had taken the parolee to the precinct to interrogate him, and Zwaryczuk demanded to know why the police were interrogating the parolee at the police station, which he felt was unnecessary. (Heba Dep. 89:16-23.) At around 2:00 a.m., Plaintiff left the precinct. (Heba Dep. 90:6-9.) A few hours later, early that same morning, the police contacted Plaintiff, requesting that Plaintiff come to the police station to release the parolee. (Heba Dep. 90:10-15.) Plaintiff called Zwaryczuk for instruction, and Zwaryczuk

directed him not to go to the precinct because he did not believe it had been necessary for the police to interview the parolee the entire night in the absence of an arrest warrant and a "parole hold." (Heba Dep. 90:22-91:9; Zwaryczuk Dep. 54:3-9.) Plaintiff disregarded his supervisor's direction and went to the station to release the parolee. (Heba Dep. 92:2-4.)

In connection with the foregoing events, Plaintiff applied for several hours of overtime. (Heba Dep. 97:15-18, 99:13-101:4.) Zwaryczuk, however, only approved one-and-a-half hours of overtime. (Heba Dep. 102:14-103:4.) Plaintiff requested a meeting with Zwaryczuk and Zwaryczuk's supervisor, Reiter, to discuss the denial. (Heba Dep. 86:7-10.) At the meeting, an argument erupted between Plaintiff and Zwaryczuk, during which Zwaryczuk called Plaintiff "an arrogant person, spoiled brat and prima donna." (Heba Dep. 86:12-87:2.) Plaintiff was offered the opportunity to transfer to the Special Offenders Unit in Queens, but he declined because he wanted an automatic assignment rather than have to go through another application process. (Def.'s 56.1 ¶ 24; Pl.'s 56.1 ¶ 24.) After the meeting, while Plaintiff and Zwaryczuk were exiting Reiter's office, Zwaryczuk allegedly called Plaintiff a "camel jockey." (Heba Dep. 112:4-8.) Reiter did not hear this comment, but it appears that Plaintiff complained to Reiter, who did not take any action. (Heba Dep. 114:15-22; *see* Pl.'s 56.1 ¶ 23.)

### D. Defaced Article and Photographs

At some point during Plaintiff's assignment in the TOP Unit, Plaintiff alleges that a co-worker showed him a document comprised of an article Plaintiff had at his desk entitled "Proud to be an Egyptian" and an unrelated picture of several holy men. (*See* Schulman Decl. Ex. D; Heba Dep. 141:9-20; Def.'s 56.1 ¶ 25.) The caption to the picture stated "[Unintelligible] holy men were among millions seeking a plunge yesterday at the confluence of three rivers, one [unintelligible].

'How a bath here makes one feel is beyond words, beyond even thought,' said one participant." (*See* Schulman Decl. Ex. D.) Someone had superimposed a picture of Plaintiff's head over one of the holy men. (*See* Schulman Decl. Ex. D.) In addition, someone had handwritten the word "Egyptian" in front of the word "holy men" and Plaintiff's name "Darwish" below the words "one participant."[1] (*See* Schulman Decl. Ex. D.)

Zwaryczuk admits that he pasted a picture of Plaintiff's head on the picture, but he claims he did this years before, when Zwaryczuk and Plaintiff were co-workers, and that Plaintiff kept the picture up at his work station for months afterward because he found it humorous. (*See* Zwaryczuk Dep. 172:23-9.) Plaintiff alleges that this incident occurred just after he moved to the TOP Unit, and, although he put the "Proud to be an Egyptian" article up on his wall, he never put up the composite with the handwritten additions and his superimposed picture. (Heba Dep. 143:25-144:22.)

Plaintiff, in turn, admits that, sometime after September 11, 2001, but before November 30, 2001, he participated in pasting a picture of Zwaryczuk on a photograph of a man riding a camel, under which he or a cohort wrote the caption "John Zwaryczuk, Taliban." (*See* Heba Dep. 145:15-147:19.)

### E. November 30, 2001 Search and Seizure Incident

On November 30, 2001, in the course of executing a search warrant, Plaintiff alleges that Zwaryczuk told a police officer in front of other police officers that he "smell[ed] a camel behind him," referring to Plaintiff. (Compl. ¶ 15b; Heba Dep. 116:14-17; Def.'s 56.1 ¶ 29.) Zwaryczuk

---

[1] There also appears to be another handwritten word added to the caption and one handwritten word added to the article itself, but these words are unintelligible, and the parties do not discuss these additions. (*See* Schulman Decl. Ex. D.)

and the police officers laughed over the comment. (Heba Dep. 116:10-13.) Plaintiff does not recall the name of the police officer whom Zwaryczuk addressed. (Heba Dep. 115:15-21.)

Later that day, in the course of assisting the police in the execution of either the same or another search warrant, Plaintiff came across light switches and told Zwaryczuk that they were the kind of switches needed for the dome light of the TOP Unit's state vehicle. (Heba Dep. 125:8-11.) Plaintiff and Zwaryczuk both allege that the other stole the switches. (Heba Dep. 126:16-21; Zwaryczuk Dep. 84:24-85:1.)

After the execution of the search warrant, Plaintiff, Zwaryczuk, and parole officer Anthony Wynn drove to the police precinct together. (*See* Heba Dep. 128:19-130:4; 134:21-23; Def.'s 56.1 ¶ 31; Pl.'s 56.1 ¶ 31.) Zwaryczuk asked Plaintiff to assist the police with the inventorying of the seized property. (Heba Dep. 129:23-131:10.) Plaintiff claims he refused because he had previously received Zwaryczuk's permission to leave after the completion of the search and because the police, and not the parole officers, were responsible for inventorying the property, which was seized pursuant to a police warrant. (Heba Dep. 130:16-132:7.) Zwaryczuk allegedly cursed at Plaintiff. (Heba Dep. 134:2-7.) After they arrived at the precinct and Wynn had left the car, Zwaryczuk then allegedly demanded, "Are you disobeying me? Are you telling me no, you fucking Arab?" (Heba Dep. 135:24-136:2; Def.'s 56.1 ¶ 31.) Subsequently, Plaintiff claims, Zwaryczuk informed Plaintiff that he had been planning to take the following Monday off from work but that, instead, "I'm coming to the office especially to fuck you up, you fucking Arab." (Heba Dep. 136:3-14.) These statements apparently were not made in front of any witnesses.[2] (*See* Heba Dep. 136:3-14.)

---

[2]In his deposition, Plaintiff alleges that the offensive comments were not made before any witnesses; however, in the complaint, Plaintiff stated that the comments were made "in front of plaintiff's co-workers and New York City policemen." (*See* Compl. ¶ 15c.)

**F.    Discrimination Complaint and Alleged Retaliatory Acts**

    **1.    December 3, 2001 Discrimination Complaint**

On December 3, 2001, Plaintiff called Omoye Cooper ("Cooper"), the director of the Division's Office of Equal Employment Opportunity/Diversity Management (the "ODM"), complaining about Zwaryczuk's conduct during the November 30 search. (Heba Dep. 151:15-152:9.) Cooper informed Plaintiff she would fax him a complaint form for him to fill out and return to her. (Heba Dep. 152:10-14.) According to Cooper, before a formal complaint is filed with the ODM, an employee's communication with the ODM is confidential. (Cooper Dep. 202:17-25.) Plaintiff apparently received the form on or about December 4, 2001, filled it out, and faxed it to Cooper on December 14, 2001.[3] (Heba Dep. 212:2-213:5; Def.'s 56.1 ¶ 54; Pl.'s 56.1 ¶ 54.) Defendant claims the Division did not become aware of Plaintiff's discrimination complaint to the ODM until after he filed his written complaint on December 14. Zwaryczuk alleges that he first learned that Plaintiff had complained about his use of bigoted epithets from a union representative on January 22, 2002. (*See* Zwaryczuk Dep. 88:1-20; 195:4-198:21.)

    **2.    Counseling Memorandum**

The same day that Heba initiated his compliant with the ODM, Zwaryczuk, on December 3, 2001, wrote a memorandum to Reiter and Reiter's immediate supervisor, Deputy Regional Director Lou Cali ("Cali"), describing Plaintiff's insubordination and alleged theft on November 30, 2001. (*See* Schulman Decl. Ex. L.) In the memorandum, Zwaryczuk recommended Plaintiff's

---

[3]Plaintiff stated in his declaration dated January 22, 2006 that he faxed his completed discrimination complaint form to Ms. Cooper on December 4, 2001. However, Plaintiff had earlier testified that he dated the form December 14, 2001. (*See* Heba Dep. 212:19-25.) In addition, Plaintiff admitted in his counter-statement of material facts that he had faxed the form to Ms. Cooper on December 14. (*See* Pl.'s 56.1 ¶ 54; Def.'s 56.1 ¶ 54.)

reassignment out of the TOP Unit.  (*See* Schulman Decl. Ex. L.)  Later on December 3, Cali, Reiter, and Zwaryczuk met in Cali's office to discuss the issues raised in the memorandum.  (Cali Dep. 28:7-30:17.)

On December 7, 2001, Plaintiff received a counseling memorandum that had been prepared by Zwaryczuk.  (Compl. ¶ 18; Heba Dep. 155:21-156:6.)  The counseling memorandum stated that Plaintiff had removed two switches from lighted pictures without authorization for the purpose of using them for the dome light of the TOP Unit's state vehicle.  (Schulman Decl. Ex. E.)  In addition, the memorandum asserted that Plaintiff had refused Zwaryczuk's order, made at the request of the NYPD, to assist with the warrant inventory.  (Schulman Decl. Ex. E.)  The memorandum further recommended that Plaintiff be reassigned out of the TOP Unit because he was not a "team player." (Schulman Decl. Ex. E.)  The counseling memorandum was placed in Plaintiff's personnel file.  (*See* Heba 173:25-174:14.)  Apparently, counseling memoranda are removed from an employee's file automatically after three years or after one year upon request.  (*See* Heba Dep. 173:24-174:14; Schulman Decl. Ex. I at 662.)  Although Defendant alleges that counseling is not discipline, Plaintiff's position is that it constitutes a disciplinary measure.

### 3.  Negative FBI Recommendation

Also on December 7, 2001, Zwaryczuk called the FBI to advise it that he wanted to change his earlier positive recommendation of Plaintiff to a negative recommendation.  (Zwaryczuk Aff. ¶ 8, Ex. B.)  After Zwaryczuk's conversation with the FBI, the FBI contacted Reiter, who confirmed that Plaintiff had been insubordinate and that, as a result, a counseling memorandum had been placed in his personnel file and he would be transferred to a different unit.  (Reiter Decl. ¶ 15, Ex. C.)  The FBI formally interviewed Zwaryczuk and Reiter on separate dates in early February 2002,

and both stated that they could no longer provide a positive recommendation for Plaintiff. (Zwaryczuk Aff. Ex. C; Reiter Decl. Ex. D.)  The FBI discontinued Plaintiff's application in July 2002 due to Zwaryczuk's and Reiter's recommendations, as well as another unrelated negative recommendation and past issues involving outstanding debt.  (*See* Schulman Decl. Ex. V.)

### 4. Transfer to Regular Unit

Plaintiff was restricted to desk duty for the remainder of his time at the TOP Unit.  (Heba Dep. 163:25-164:11.)  Plaintiff requested to be transferred to his previous post in the Brooklyn II Special Offenders Unit, but Defendant claims that there were no special assignment openings there at the time.  (Cali Dep. 76:7-8.)  Plaintiff believes Defendant's denial of his request was in retaliation for his workplace discrimination complaint.  On January 10, 2002, Plaintiff was transferred to the "Brooklyn I" parole office where Defendant alleges there was an operational need for parole officers.  (Heba Dep. 164:12-14; Cali Dep. 76:9-11.)  In the Brooklyn I office, Special Parole Officer Edward Angrisani was Plaintiff's new supervisor.  (Heba Dep. 193:3-15.)

### 5. Plaintiff's New Assignment

In Plaintiff's new assignment, Angrisani allegedly assigned Plaintiff to undesirable work and forced him to perform dangerous tasks, such as curfew checks, without a partner present.  (Compl. ¶ 23.)  Angrisani also allegedly ordered Plaintiff to perform an assignment but failed to inform him that the parolee had been arrested, thereby purportedly endangering Plaintiff.  (Compl. ¶ 24.)  Plaintiff concedes that everyone had problems with Angrisani.  (Heba Dep. 193:21-25.)

Sometime around April 2002, Plaintiff alleges that he "found three articles on his desk about anti-Semitism and anti-Zionism, clearly implying that he was prejudiced against Jewish people because of his national origin."  (Compl. ¶ 15e.)  Plaintiff contends that Zwaryczuk put the articles

on his desk.  (Pl.'s 56.1 ¶ 49.)

On August 6, 2002, Plaintiff received a performance evaluation from Angrisani.  (*See* Schulman Decl. Ex. W.)  Plaintiff certified that he read the evaluation, and wrote on the evaluation in response, "This evaluation is the most impressive and the finest I've ever received.  Thanks Boss."  (*See* Schulman Decl. Ex. W.)

Just over one week later, on August 27, 2002, Plaintiff brought to work pictures of his newborn son to show his co-workers.  (Def.'s 56.1 ¶ 52; Heba Dep. 195:18-22.)  Upon viewing a picture of the baby covering his face with his hands, Angrisani commented that the baby did not want to be "photo-imaged."[4]  (Heba Dep. 195:23-196:5.)  According to Plaintiff, Defendant "was clearly implying that my newborn son was somehow similar to a criminal.  I had never heard him say that about any of my co-workers' children."  (Heba Decl. ¶ 15.)  Plaintiff alleges Angrisani's comment "was part of the Defendant's campaign of retaliation and retribution against him for filing complaints of employment discrimination."  (Pl.'s 56.1 ¶ 52.)

On October 24, 2002, Plaintiff was transferred to a regular unit in the Brooklyn II office.  (Heba Dep. 22:16-23:15.)  Plaintiff was then reassigned to the Special Offenders Unit in Brooklyn II in September 2004 but was transferred back to the regular unit in September 2005 because of alleged funding issues.  (Heba Dep. 189:20-190:25.)  He is apparently still employed in the regular unit in Brooklyn II.

## G.    Procedural History

As mentioned earlier, Plaintiff filed a formal, written employment discrimination complaint with the ODM on December 14, 2001, alleging eight acts of discrimination, including the July 5,

---

[4]Photo-imaging refers to "mug shot" pictures.  (Def.'s 56.1 ¶ 52.)

2001 denial of overtime payment, Zwaryczuk's alleged racial and derogatory epithets, Plaintiff's involuntary transfer into a regular unit, and alleged retaliation by Plaintiff's superiors by changing their positive recommendations of Plaintiff to the FBI to negative recommendations. (*See* Schulman Decl. Ex. T at 1-2.) ODM director Cooper conducted an investigation into the matter. (Cooper Dep. 69:10-15.) On August 19, 2002, Cooper made a determination of no probable cause as to all of Plaintiff's allegations except the claim alleging retaliation. (Schulman Decl. Ex. T at 4.) As to the retaliation claim, Cooper found that the timing of Zwaryczuk's negative FBI recommendation brought his motivation into question. (Schulman Decl. Ex. T at 4.) Accordingly, Cooper was unable to make a determination on the retaliation claim without additional information. (Schulman Decl. Ex. T at 4.)

From December 17, 2001 to September 12, 2002, Plaintiff filed several labor grievances relating to Zwaryczuk's alleged discriminatory conduct and Angrisani's alleged discriminatory or retaliatory conduct. (*See* Schulman Decl. Exs. I & J.) All but one were denied on the merits. (*See* Schulman Decl. Exs. J.) Determination of one grievance was deferred to the ODM and the New York State Division of Human Rights, where Plaintiff's complaints were pending review. (*See* Schulman Decl. Exs. I & J.)

On January 31, 2002, Plaintiff filed a Title VII complaint with the New York State Division of Human Rights. (Def.'s 56.1 ¶ 62; Pl.'s 56.1 ¶ 62.) Plaintiff requested that the Human Rights Division close the complaint in order to bring the instant action. (Heba Dep. 223:11-16.) The Human Rights Division issued a right-to-sue letter on September 5, 2003, stating that it was closing its file on the matter. (*See* Schulman Decl. Ex. X.)

Plaintiff initiated the instant action on December 1, 2003. Defendant now seeks summary

judgment in its favor.

## II.    Discussion

### A.    Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The burden is upon the moving party to demonstrate that no genuine issue with respect to any material fact exists. *See Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975).  The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. - - -, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id*. at 1776.  Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Second Circuit has recognized that courts must be cautious when granting summary judgment in employment discrimination cases because the employer's intent is frequently at issue. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  However, summary judgment may still be appropriate "even in the fact-intensive context of discrimination cases."  *Abdu Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  To

defeat a motion for summary judgment, however, the nonmoving party "must provide more than

conclusory allegations of discrimination." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.

1997). There is no genuine issue of material fact for trial unless sufficient evidence in the record

exists favoring the party opposing summary judgment to support a jury verdict in that party's favor.

*Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative,

summary judgment may be granted." *Id.* at 249-50. (internal citations omitted).

B.     **Hostile Work Environment Claim**

1.     **Relevant Law**

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for

an . . . employer to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

national origin." 42 U.S.C. § 2000e-2(a)(1) (2007). Title VII thus protects individuals from being

subjected to a "discriminatorily hostile or abusive environment" in the workplace.[5] *Harris v.

Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citation omitted). A work environment is

"discriminatorily hostile" when (1) "the workplace is permeated with discriminatory intimidation,

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment," *id.* (internal quotation marks and citations

omitted), and (2) "a specific basis exists for imputing the conduct that created the hostile

---

[5]Title VII also prohibits *quid pro quo* discrimination, or disparate treatment, in the workplace. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304-05 (2d Cir. 1995). Plaintiff is apparently only proceeding on a hostile work environment theory and not a *quid pro quo* discrimination theory. Defendant argued at length in its submissions against an anticipated *quid pro quo* claim, but Plaintiff provided no opposition on this point. Thus the court considers the claim either abandoned or never raised.

environment to the employer." *Schwapp*, 118 F. 3d at 110 (2d Cir. 1997). The discriminatory harassment must be "of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse," and the victim must also subjectively perceive the environment as abusive. *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 439, 436 (2d Cir. 1999) (citation omitted). Furthermore, the hostility must arise from the plaintiff's membership in a protected class. *Forts v. City of N.Y. Dep't of Corr.*, No. 00 Civ.1716 LTS FM, 2003 WL 21279439, at *4 (S.D.N.Y. June 4, 2003) ("An environment that would be equally harsh for all workers, or that arises from personal animosity, is not actionable under the civil rights statutes.") (citing *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)).

In order to establish a hostile work environment, a plaintiff must normally demonstrate a series of sufficiently continuous and concerted incidents that altered the conditions of his or her working environment. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (citation omitted). However, even a single incident may suffice if the discriminatory incident was "extraordinarily severe." *Id.* The factors the court must consider in evaluating a hostile work environment claim include

> (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted.

*Richardson*, 180 F.3d at 437 (internal quotation marks and citations omitted). In effect, the court must consider the totality of the circumstances, and the factors must be considered cumulatively in order to achieve a realistic view of the workplace. *Richardson*, 180 F.3d at 437; *Cruz*, 202 F.3d at 570. The question is a "mixed question of law and fact," and summary judgment is only appropriate "where application of the law to those undisputed facts will reasonably support only one ultimate

conclusion." *Richardson*, 180 F.3d at 437.

## 2. Application

Even construing all the facts in Plaintiff's favor, the court finds that Plaintiff has failed to raise a triable issue of fact, based on the five factors to be considered in evaluating a hostile workplace claim. *See Richardson*, 180 F.3d at 437. First, regarding frequency, Plaintiff has described about a half a dozen incidents[6] that took place on five different days spanning July 2001 to August 2002. These incidents are not so frequent as to compel the court to view them as permeating the workplace.

Second, the severity of the incidents simply do not rise to the level of creating a hostile work environment. Zwaryczuk allegedly made several offensive, bigoted comments directed at Plaintiff, including calling Plaintiff a "camel jockey," an "arrogant person, spoiled brat and prima donna," and a "fucking Arab," and stating to Plaintiff that he would "fuck you up." In addition, Zwaryczuk allegedly told a police officer that he "smell[ed] a camel behind him," referring to Plaintiff. All but the last of the comments occurred during two heated arguments between Plaintiff and Zwaryczuk, the first argument concerning overtime pay, in early July 2001, and the second argument concerning Plaintiff's insubordination, on November 30, 2001. The "smelled a camel" comment occurred on the same day as the second argument.

Plaintiff describes Zwaryczuk as a person with a bad temper who frequently uses profanity. Although Plaintiff states that they were once "very close," their relationship quickly devolved once Plaintiff was required to report to Zwaryczuk in the TOP Unit. The rocky relationship appeared to

---

[6]Although Plaintiff alleges nine separate discriminatory or hostile comments or occurrences, in some cases, more than one comment comprise the same incident, as they occurred during the same conversation or argument.

have both ups and downs. In between the July and November conflicts, Zwaryczuk recommended Plaintiff for a commendation. When Plaintiff applied for an Arabic language interpreter position with the FBI after September 11, 2001, Zwaryczuk provided Plaintiff with a positive recommendation.

Zwaryczuk's alleged invectives are, without question, insulting and offensive. However, given the context of their relationship and, furthermore, the context of the arguments, the comments are more reflective of the growing antagonism between former friends, rather than discriminatory animus. Zwaryczuk's angry outbursts, while inappropriate, simply do not constitute an environment of pervasive hostility and abuse directed toward Plaintiff because of his race or national origin.

Nor does the incident involving the "Proud to be an Egyptian" article alter the mix. Plaintiff himself admits that he participated in pasting a picture of Zwaryczuk on a photograph of a man riding a camel, under which he or a cohort wrote the caption "John Zwaryczuk, Taliban." It appears that both Plaintiff and Zwaryczuk engaged in these types of crude antics in the workplace. It cannot be said, therefore, that Zwaryczuk's "Proud to Be an Egyptian" article created a hostile work environment directed at Plaintiff when Plaintiff himself participated in objectionable conduct of like kind, contributing to what appears to be a workplace atmosphere generally permissive of inappropriate jesting.

With respect to the anti-Semitism and anti-Zionism articles, even if Plaintiff could prove that Zwaryczuk placed them on Plaintiff's desk, such a gesture simply does not rise to the level of severe harassment required for a finding of hostile work environment. Nor does Angrisani's "photo-image" comment establish the requisite severity and pervasiveness, even when considered cumulatively with

all of the evidence Plaintiff presents.[7]

The remaining hostile workplace factors weigh in favor of Defendants. Plaintiff has not alleged that he was physically threatened; nor has he described if and how the conduct in question unreasonably interfered with his work. In addition, beyond conclusorily stating in the complaint that he suffered from emotional distress, humiliation, and anguish, Plaintiff has failed to provide any evidence of psychological harm, if any, resulting from the alleged incidents.

Accordingly, Plaintiff has not raised a triable issue concerning the existence of a hostile work environment, and his Title VII claim on this ground must therefore fail. Defendant's summary judgment motion, with respect to this claim, is granted.

### C.  Retaliation Claim

#### 1.  Relevant Law

Title VII prohibits employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e -3(a). To determine whether summary judgment is appropriate in a Title VII retaliation claim, courts apply the three-part burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of proving a *prima facie* case of retaliation. *Id.* The defendant may then rebut by articulating a legitimate, nondiscriminatory reason for its adverse

---

[7]It is not clear that Plaintiff includes this incident among those that allegedly establish his hostile work environment claim. With respect to this incident, he states only that Angrisani's comment "was part of the Defendant's campaign of retaliation and retribution against him for filing complaints of employment discrimination." (*See* Pl.'s 56.1 ¶ 52.)

employment action. *Id.* The defendant's burden at this stage is merely one of production, not persuasion. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511 (1993). However, once the defendant meets this burden, "[t]he presumption of [retaliation] . . . drops out of the picture." *Id.* at 510-11 (internal quotation marks and citation omitted). The burden then shifts back to the plaintiff to present sufficient evidence to permit a rational finder of fact to infer that the defendant's proffered reason is a pretext and that the employment decision was motivated by unlawful discrimination. *See Stern v. Trs. of Columbia Univ. in the City of N.Y.,* 131 F.3d 305, 312 (2d Cir. 1997).

The employee's burden of proof at the *prima facie* stage of a summary judgment motion is *de minimus. See Bennett v. Watson Wyatt & Co.,* 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001). However, the employee must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive. *See Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 204 (2d Cir. 1995). To make out a *prima facie* case of retaliation, the employee must demonstrate: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *See Hunter v. St. Francis Hosp.,* 281 F. Supp. 2d 534, 546-47 (E.D.N.Y. 2003) (citing *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir. 1998)). The adverse employment action must be one that a reasonable employee would have found materially adverse; *i.e.*, "it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Sante Fe Ry. Co.*, --- U.S. ---, 126 S. Ct. 2405, 2415 (2006). With respect to the causation element, a causal connection may be established by showing that the retaliatory action occurred close in time to the protected activity. *Hunter*, 281 F. Supp. 2d at 547.

## 2. Application

Plaintiff argues that he has established a *prima facie case*.  According to Plaintiff, upon engaging in the protected activity of filing an internal complaint of discrimination with the ODM, Defendant's superiors retaliated by (1) issuing a disciplinary warning in the form of a counseling memorandum that was placed in his personnel file, (2) transferring him out of the TOP Unit into a less-elite unit, and (3) rescinding their earlier positive recommendations of him to the FBI and replacing them with negative references.  Defendant counters that it did not learn of Plaintiff's discrimination complaint until after the challenged actions occurred, and Plaintiff, therefore, could not have retaliated.

The court finds that Plaintiff has made out a *prima facie* case.  Plaintiff initiated his ODM complaint on December 3, 2001, through a phone call to an ODM officer.  That same day, Zwaryczuk wrote a memorandum to Reiter and Cali, recommending Plaintiff's reassignment out of the TOP Unit.  (*See* Schulman Decl. Ex. L.)  Four days later, on December 7, 2001, Defendant placed in Plaintiff's file a counseling memorandum, which Defendant refers to as a disciplinary warning, describing certain alleged misconduct.  It was also on December 7 that Plaintiff was informed that he would be transferred out of the TOP Unit, and that Zwaryczuk called the FBI to change his earlier positive recommendation of Plaintiff to a negative recommendation.  After Zwaryczuk's conversation with the FBI, the FBI contacted Reiter, who confirmed that Plaintiff had been insubordinate and would be transferred.  The FBI formally interviewed Zwaryczuk and Reiter in early February 2002, well after Plaintiff filed his formal complaint on December 14, 2001, and both stated that they could no longer provide a positive recommendation for Plaintiff.

Defendant's actions described here may very well have dissuaded a reasonable worker in Plaintiff's position from pursuing his or her charge of discrimination. In addition, the close temporal relationship between the alleged retaliatory actions and Plaintiff's discrimination complaint satisfies the causation element. Therefore, Plaintiff has established a *prima facie* case of retaliation, thereby shifting the burden to Defendant to articulate a legitimate, nondiscriminatory reason for its actions.[8] *See McDonnell Douglas Corp.,* 411 U.S. at 802.

Defendant, in turn, has satisfied its burden. Plaintiff concedes that he disregarded Zwaryczuk's directives on two occasions: on July 3, 2001, when Plaintiff picked up a parolee from a police station in direct contravention to Zwaryczuk's instruction, and on November 30, 2001, when Plaintiff refused to assist in inventorying seized property despite Zwaryczuk's direct order that he do so. Defendant alleges that the counseling memorandum, the transfer, and the negative FBI recommendations resulted from Plaintiff's insubordination and from Plaintiff's alleged theft of property from the premises searched on November 30.[9] Accordingly, Defendant has articulated legitimate, nondiscriminatory reasons for its actions, thus shifting the burden back to Plaintiff to demonstrate that Defendant's articulated reasons are merely pretextual. *See Stern,* 131 F.3d at 312.

---

[8]Plaintiff also appears to allege that one of his supervisors, Angrisani, retaliated by giving him generally undesirable and dangerous work and by making an offensive comment regarding Plaintiff's newborn son on August 27, 2002. With respect to the undesirable and dangerous work allegation, Plaintiff has not provided any evidence to demonstrate a causal relationship between the assignment of undesirable and dangerous work and Plaintiff's discrimination complaint. With respect to Angrisani's comment concerning Plaintiff's baby, the court similarly finds that Plaintiff has failed to allege any causal link. Moreover, the court finds that Angrisani's comment would not have discouraged a reasonable person in Plaintiff's position from pursuing his or her discrimination complaint. Accordingly, the court does not rely on the allegations involving Angrisani in finding that Plaintiff has stated a *prima facie* case of retaliation.

[9]Although Plaintiff denies the allegation of theft, Reiter states that Plaintiff's insubordination alone was sufficient to justify the challenged acts. (*See* Reiter Decl. ¶ 11.)

The court finds that the facts alleged by Plaintiff raise a genuine issue of material fact with respect to whether Defendant's proffered reasons are pretextual. The timing of the challenged acts is suspect. Defendant had been insubordinate on July 3, well before the November 30 incident, though it does not appear that he was accused of theft prior to November 30. Although he could have received a counseling memorandum after his earlier insubordination, and although he could have been transferred at an earlier time, these actions against Plaintiff, including the negative FBI recommendations, occurred immediately following Plaintiff's complaint alleging discrimination. Defendant argues that it was not aware of Plaintiff's complaint to the ODM until after he filed his *written* complaint on December 14, 2001, which was after the challenged acts occurred. However, this is an issue of fact that the court resolves in favor of Plaintiff for the purposes of the instant motion. Thus, the court finds that Plaintiff's facts suffice to raise an issue with respect to whether Defendant's reasons for carrying out the challenged acts are merely pretextual.

Accordingly, Plaintiff's retaliation claim survives summary judgment.

### D.     Eleventh Amendment Immunity

Defendant alleges that Plaintiff's third through sixth claims must be dismissed because they are all state and common law claims from which the Division has Eleventh Amendment immunity. Plaintiff alleges that the Division's conduct violated his rights under the New York Human Rights Law (third claim), the New York City Human Rights Law (fourth claim), and under the common law theories of intentional infliction of emotional distress (fifth claim) and negligence (sixth claim). Defendant provides no opposition.

The Eleventh Amendment "prohibits suits against a state or one of its agencies in federal court absent the state's consent or a valid abrogation of its sovereign immunity by an act of

Congress." *Hill v. Goord*, 63 F. Supp. 2d 254, 259 (E.D.N.Y. 1999). The New York State Division of Parole, an agency of the state of New York, did not grant consent; nor has Congress abrogated its immunity. *See* N.Y. Executive Law § 259(1); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). Thus, the Division is not subject to suit, and Plaintiff's state and common law claims (the third through sixth claims as articulated above) are dismissed.

## III.    Conclusion

For the reasons set forth above, Defendant's motion for summary judgment is granted in part and denied in part. Plaintiff's workplace discrimination claim and the state and common law claims are dismissed. Plaintiff's retaliation claim survives summary judgment.


SO ORDERED.


DATED:        Brooklyn, New York
              December 11, 2007


                         _____/s/_____
                              DORA L. IRIZARRY
                           United States District Judge

23